Craycraft, &c. v. National Building & Loan Association.

---

CASE 25—ACTION BY NATIONAL BUILDING & LOAN ASSOCIATION AGAINST GEORGE CRAYCRAFT, &C., FOR SPECIFIC PERFORMANCE OF CONTRACT TO PURCHASE REAL ESTATE.

# Craycraft, &c. v. National Building & Loan Association.

APPEAL FROM JEFFERSON CIRCUIT COURT, CHANCERY DIVISION.

JUDGMENT FOR PLAINTIFF AND DEFENDANTS APPEAL.  REVERSED.

CORPORATIONS—VOLUNTARY LIQUIDATION—RIGHTS OF STOCKHOLDERS AMONG THEMSELVES.

Held:   1. Among the rights *inter se* of stockholders of a corporation, on its dissolution, is to share pro rata in proportion to the number of shares held by each in its assets, on a money basis; and though a majority of the stockholders vote that, so long as it lasts, the real estate of the corporation may be purchased at certain prices by the stockholders in exchange for their shares, and that, if the remaining assets are sufficient to pay the other stockholders more than is received by the stockholders who exchange stock for land, the surplus shall be distributed to all stockholders alike, the corporation can not give an indefeasible title to stockholders so desiring to purchase, as, if they thus get a greater proportion of the assets than the other stockholders, they may be compelled by dissenting stockholders to refund to the extent of the surplus.

STROTHER, HARDIN & STROTHER, AND H. M. JOHNSON, FOR
APPELLANTS.

1. Our contention is, that a majority of the stockholders of a
corporation can not wind up its affairs by adopting a scheme
or plan which simply seems fair to such majority.

2. Every stockholder in such corporation that is being wound
up, has the right to an *absolute, equitable* and *equal* distri-
bution of all the surplus assets of the corporation after the pay-
ment of its debts and liabilities, and not simply a *near ap-
proach* to an equal distribution.

3. Where, in such wind up there may not be money enough
with which to make these stockholders who do not desire to,
or who, for any reason, can not avail themselves of a plan of
exchanging stock of the association for its real estate equal
to those who go into such plan, if this contingency should arise,
then such stockholders who do not avail themselves of such
plan, would have, as we contend, a right to look to that real
estate with those who had availed themselves of such plan
of exchange; otherwise a preference would be given to those
stockholders who had availed themselves of said plan.

### AUTHORITIES CITED.

Economy, &c. Assn. v. Paris Ice Co., 24 R., 107; Washburn
on Real Property, vol. 3 (5th ed.), p. 486; Mercantile Trust
Co. v. South Park Residence Co., 94 Ky., 271, Kentucky Stat-
utes, sec. 561; Eminence B. & L. Assn. v. Bohanan, 21 R.,
589; Globe B. & L. Assn. v. Spellman, 23 R., 431;
U. S. B. & L. Assn. v. Reed, 23 R., 342; Vinton v. Nat.
B. & L. Assn., 23 R., 2021; Witts v. Paducah B. & L. Assn.,
24 R., 21, 4 Am. & Eng. Ency. of Law, p. 1080; Rogers v.
Rains, 18 R., 768; Simrall v. Com. Bldg. Trust Assignee, 20
R., 1801; Forwood v. Eubank Assignee, 20 R., 1845; Bertch
v. B. & L. Co., 48 S. W., 954; Allen v. Russell, 78 Ky., 105;
Endlich on Bldg. Assns., sec. 526; Goodrich v. City Loan Assn.,
54 Ga., 98, 48 Ga., 445.

WOOLFOLK & KLEIN, FOR APPELLEE.

Appellee, by written agreement of over two-thirds of its stock-
holders agreed to go into liquidation, its assets being mostly real
estate of the book value of $140,000.

It owed about $10,000 outside of what it owed the stock-
holders. Believing it could not sell its real estate for its book
value, it was agreed that certain of the stockholders should take

Craycraft, &c. v. National Building & Loan Association.

portions of the real estate in exchange for their stock, at its book value with eight per cent. added.

The stockholders being numerous and the property large and valuable, this plan was adopted by a majority of the stockholders as the only one whereby the real estate could be disposed of at near its value. Under this plan about $30,000 worth of the real estate was contracted for.

One of the stockholders who made this agreement having doubts of its legality as against those stockholders who did not go into this plan, refused to accept a deed to the real estate tendered to him in order to make a test case, and the lower court having upheld the plan adopted to be valid, the minority stockholders excepted and have appealed, claiming that such plan is inequitable and unfair.

We submit that the majority in interest have the right to decide as to this question.

## AUTHORITIES CITED.

Economy, &c. Association v. Paris Ice Co., 24 R., 107 (Ky.); Sec. 110, Thompson on Building Associations, 2d ed.; State v. Building Assn., 35 Ohio. St., 258; Wilson v. Proprietors of Central Bridge, &c., 9 R. I., 590; Thompson on Corp., vol. 7, sec. 8768; Booz's Appeal, 109 Pa. St., 592; Thompson on Bldg. Assns., 289; Thompson on Bldg. Assns. sec. 291, p. 589; Thompson on Bldg. Assns. sec. 293, p. 593; Thompson on Bldg. Assns., sec. 295, p. 603; Sjoberg v. Security S. & L. Assn. (Minn.), 75 N. W. Rep., 1116, 84 Md., 625; William Doodrich v. City L. & B. Association of Augusta, 54 Ga., 98.

OPINION OF THE COURT BY JUDGE O'REAR—REVERSING.

Appellee is a building and loan association organized and operating under the laws of Kentucky, and subject to the provisions of the present Constitution and statutes. Appellee found it was unable to prosecute its business with success, and, in the course of its business, by investment in real estate and the purchase of real estate for debts, it acquired real property of the value of about $140,000 at its book value; that is, at the price which the property cost appellee. It had a large number of stockholders, holding a large amount of its capital stock, which, at its book value

(that is, the aggregate of dues paid on stock, and of the dividends which had been declared and credited to the stock), amounted to a sum much in excess of the value of the real estate. Its assets, consisting of notes secured by mortgages and by pledges of stock, together with the book value of the real estate, practically balanced the liabilities of the company to its stockholders. The pleadings claim, and proof in this case indicates, that this real estate could not be sold in the ordinary and usual way of selling for as much as $140,000, by practically one-third of that amount; that is, the real estate could not have been sold in the usual way for more than $93,000 or $94,000. To sell this property, therefore, in this way, would have made the company unable to pay its stockholders in full, by the sum of $46,000, if the result should be as anticipated. Taking into account depreciations in value and losses which must necessarily result in collecting its personal assets, the company, in the usual way of winding up, is probably insolvent. With this condition confronting them, the directors, through a committee, while in process of liquidation, conceived a plan of disposing of this real estate to its stockholders by adding to the cost value of the real estate arbitrary amounts, not exceeding eight per cent. of any one piece of property, and accepting in payment therefor stock of the stockholders at its book value, with the stipulation that in the event the assets, upon final distribution, were sufficient to pay to the stockholders who did not purchase real estate more than was received by the stockholders who exchanged stock for real estate, such surplus should be distributed to all of the stockholders alike. It will be observed that there was no final surrender of the stock, of the rights of stockholders, upon the exchange of stock for real estate. In order to ratify this plan, a meeting

of the stockholders was called, and was attended by the holders of a bare majority of stock—a bare quorum—and the plan was ratified by a bare majority; and, of this bare majority of the stock, twenty-six shares attending the meeting voted against approving the plan. Under the plan adopted, offers for the property by stockholders to be paid in stock, were authorized to be made up to February, 1903, at which time the right of stockholders to make such exchange expired, under the terms of the plan. After such approval as was made by the stockholders of the proposed plan for disposing of the real estate, printed propositions containing the substance of the above plan and a list of real estate of the appellee, with prices, were mailed to each of the stockholders. Prior to the 1st of February, 1903, the company received propositions under the plan for about $30,000 worth of its real estate, and no more. About the time this plan was adopted by the directors, a resolution was adopted by the corporation, in substance, that it would proceed to dispose of its assets, pay its liabilities, and wind up the business. This did not legally put the company in liquidation. See Economy, etc., Association v. Paris Ice Company, 113 Ky., 246, 24 R., 107, 68 S. W., 21. In the meantime, however, a consent such as is required by section 561, Ky. St., 1899, was signed by the necessary number of stockholders, and lodged with the directors in the latter part of January, 1903; and between that time and the 1st of February, at which time the plan above mentioned expired, the appellant Craycraft made a proposition to exchange stock of appellee of the book value of $648 for the lot described in the petition, upon condition that the corporation would convey the property to him by a good, merchantable, indefeasible fee-simple title. This proposition was accepted by the appellee,

and a deed was drawn and tendered to appellant, which he declined to accept. This suit was brought for the specific performance of that contract.

The question involved here is whether the plan for disposing of its real estate is legal, whether appellant, at this stage of the winding up of appellee, would obtain by the deed tendered a good, merchantable, indefeasible fee-simple title to the property described in the petition. These propositions involve the question whether the transaction above set forth is a sale of the lot described in the petition, such as they can lawfully make, or whether it is a mere distribution of assets to the stockholders receiving the property, and whether the property itself remaining in the hands of the stockholders, at the suit of dissenting or nonconsenting stockholders, would be brought in for the purpose of procuring an equal distribution of the assets of the corporation among all of its stockholders alike. It will be observed that only about $30,000 worth of this $140,000 worth of real estate was bargained for on the plan above described before the expiration of the plan, which leaves $110,000 worth, as to which there is no assurance that it can be sold in the same way or upon the same terms under renewal or extension of the plan; and, if not sold, its sale in the ordinary way of winding up a corporation may make the corporation so insolvent as to result in other stockholders receiving a much less pro rata from the assets of the corporation than those who get real estate for their stock.

That appellant was entitled to receive not only a deed, with covenant of general warranty, conveying the fee-simple title but was to receive an indefeasible title is admitted. If the scheme evolved by the majority stockholders, and above set forth, did not enable the corpor-

ation to pass such title to the stockholders whose bids might be accepted, then the specific execution of the contract between appellant and the association should not be adjudged. It should be borne in mind that the corporation is not indebted. Its sole liability is to its stockholders.

The argument is made that, in the course of a voluntary liquidation, upon a statutory dissolution of a corporation, the will of the majority in interest as to the time and method of procedure, so long as it does not produce a substantial inequality in the result, must be allowed to control. The argument is utilitarian, and is opposed by the characterizing principles of the common law, which regard the rights of the individual in private property, in preference to the will or welfare of any greater contending number. The question of the rights of the stockholders as among themselves is one of implied contract. It is that, upon a dissolution of the joint enterprise for which they formed the corporation, its assets, after paying its indebtedness, will be distributed pro rata among the stockholders according to interest. It may be that, if these assets were of a quality capable of an exact partition in the proportion represented by each shareholder's interest, they might be distributed in specie. But that can rarely happen. The only dividend which can ordinarily receive the devisor of share interests is money. The basis or contribution, of reconing liability, and of apportioning the final results is money. To liquidate, in law, is to make certain or exact, in units of money, and, in the sense which the word is used in winding up a corporation, to discharge, in lawful money, the liabilities so ascertained. Each stockholder is entitled, as a matter of right, and as an incident of his contract, to participate in the distribution on that basis. Although the majority in interest and numbers may conceive their in-

terest to be, and although it may be a fact that their interest is, to hold the assets of the corporation for future enhancement of value or for other uses, the dissident members are not bound to yield their right to a legal liquidation to the welfare of the others. To make them do so would be compelling them, against their wills, to enter into a different contract from the one originally made. The doctrine being discussed is thus stated by Cook on Stock and Stockholders (1st Ed.), 636. "When the regular business of a corporation has been brought to a close, the shareholders have a right to an immediate distribution of the corporate assets. They can not, therefore, be compelled to accept other property or rights in lieu of cash." The authorities cited by the author support the text. Using the instant case as an illustration, it may be, and probably is, that among the nonconsenting or dissenting stockholders there are some who hold but a few shares—possibly some who hold only a single share—of stock. It is not likely that such of them would be able to find a piece of real estate on the list of the same value as his share or shares. He may not be able or willing to invest money in addition in the real estate offered, and especially at the price offered. He would then be compelled to yield absolutely to other stockholders his claim as stockholder upon $140,000 of real estate of the corporation, and to take the chances of realizing an equal proportion from the remaining assets of the company. It might be advisable for him to adopt that plan. But the question is, does the law compel him to relinquish a present valuable interest for a chance? It is not true, strictly, that every stockholder has an equal chance in the proposed plan, even if an even chance in anything except money would satisfy his right. For there are about $200,000 worth of shares, at book value, with only

about $140,000 of real estate at book value.  Some of these shares must necessarily fail to participate in this partition of the real estate, and therefore be compelled to take whatever chance there may be in realizing an equivalent sum, proportionately, from the other assets of the company.  If they should fail, to that extent there would be an unequal distribution of the assets of the corporation among the shareholders of the same rank, if the scheme here involved should be adjudged by the court.  Such a distribution would never be decreed or sanctioned by a court of chancery.  Nor are we aware of either principle or precedent that would allow a minority stockholder to be bound against his will by a resolution of the majority that would or could produce such result.

It is suggested that this scheme is particularly desirable and beneficial to all stockholders, because thereby extraordinary costs of winding up by proceedings in the courts are averted.  Under section 561, Ky. St., 1899, the board of directors of a corporation in voluntary liquidation are given ample power to do all that is necessary to pass title to its real estate by sales and conveyances, by public or private sales.  Indeed, it is made their duty to expeditiously take these steps to reduce the assets into condition for distribution.  The suggestion of the costs and court expenses is probably more a bugaboo than a danger.

We do not mean to say that the plan submitted to the stockholders was not a judicious one.  If all the stockholders had agreed to it, it is altogether probable it would have worked out satisfactorily.   But even if that were clearer than is made to appear, we know of no legal way to compel them to enter into the agreement, for, at last, any deviation from the legal enforcement of the stockholders' rights is a matter of agreement among the parties.  All

the assets of the corporation in liquidation are a trust fund, which must be ratably distributed among all the stockholders of the same rank. If any of them are permitted to withdraw a greater proportion than others (i. c., any part of it that they were not entitled to), the former would be compelled to restore at least the surplus, that the others might be made equal. William Goodrich v. City L. & B. Ass'n, 54 Ga., 98; Allen v. Russell, 78 Ky., 105; Endlich on Building Associations, 526.

From this it follows that appellant would not get an indefeasible title to the lot contracted by him, for, upon a failure of any of the nonconcurring stockholders to receive an equal sum or value on final distribution, he could be compelled at the suit of such stockholders to surrender to them at least the surplus in value in the lot over his pro rata of all the corporation assets.

The judgment of the circuit court decreeing the specific performance of the contract of exchange of the lot for the seven shares of stock is reversed, and cause remanded, with directions to dismiss the petition.